UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **JOSEPH MICHAEL HUME,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 2:16-CV-00954-MHH |
| | ) |
| **WILLIAM L. HUGHES, KERRY G. LOVELESS, MILLS-CONOLY ENGINEERING, P.C.,** | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

This action arises from injuries plaintiff Joseph Michael Hume suffered after he entered an enclosure containing high voltage electrical equipment on the University of Montevallo campus in 2015.

In 2002, defendant Mills-Conoly Engineering assessed the University of Montevallo's existing electrical-distribution system and prepared recommendations for corrective action to the system. (Doc. 76-5, p. 13). According to Mr. Hume, Mills-Conoly failed to identify deficiencies in the system, including safety code violations relating to the enclosure he entered. (Doc. 86, p. 4). Before the close of discovery, Mills-Conoly moved for summary judgment, arguing that Alabama's statute of repose bars Mr. Hume's claims. (Doc. 33). The Court permitted the parties to continue discovery and reset the dispositive motion deadline. (Doc. 69). Mills-

Conoly then filed an amended motion for summary judgment. (Doc. 77). For the reasons explained below, the Court grants Mills-Conoly's motion for summary judgment.

I.     **STANDARDS OF REVIEW**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences in the light most favorable to the non-moving party. *Asalde v. First Class Parking Sys.*, 898 F.3d 1136, 1138 (11th Cir. 2018). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Mr. Hume's Injury

The factual record in this case is extensive. The facts relevant to Mills-Conoly's motion for summary judgment are these: at the time of his accident, Mr. Hume was a sophomore at the University of Montevallo. (Doc. 76-68, p. 12). One summer evening, he and two friends began playing frisbee golf on the campus's "makeshift course." (Doc. 76-68, pp. 19, 182). While playing, one of the frisbees fell into an unmarked enclosure connected to Farmer Hall, the University's Student Center. (Doc. 76-68, pp. 16, 36). One side of the enclosure is a chain-link locked fence; the other two accessible sides are brick. (Doc. 76-70; *see also* Doc. 76-68, pp. 42–43). From where Mr. Hume was standing, he faced a brick wall; Mr. Hume did not approach the enclosure from the chain-link side. (Doc. 76-68, pp. 42–43; *see also* Doc. 76-76 (photograph where Mr. Hume marks where he climbed onto the wall)). Mr. Hume asked his friends if they could retrieve the frisbee. (Doc. 76-68, p. 55). When his friends said that they could not get the frisbee from their side, Mr. Hume "hopped up on top of the wall and hopped in[to the enclosure] to recover the frisbee." (Doc. 76-68, pp. 55–56). At the time of Mr. Hume's accident, there were no warning signs on the enclosure indicating that it was a high-voltage area. (Doc. 57-1, pp. 276, 298; Doc. 78-12, pp. 75–76).

Mr. Hume swung into the enclosure, grabbed the frisbee, and moved to leave the enclosure. (Doc. 76-68, pp. 74, 79; *see* Doc. 76-79 (noting where the frisbee was inside the enclosure)). As he left the enclosure, Mr. Hume contacted a transformer and suffered a severe shock. (Doc. 26, ¶ 15; Doc. 76-68, pp. 89–90).

Mr. Hume asserts that the enclosure should have had warning signs warning and a protective cover. (Doc. 26, ¶ 16). Mr. Hume contends that Mills-Conoly should have alerted the University to the enclosure's deficiencies and recommended installing warning signs and a protective cover. (Doc. 26, ¶¶ 138, 142).

### B. Mills-Conoly's Work for the University of Montevallo

The University first hired Mills-Conoly in 1999 to replace its fire alarm system. (*See* Doc. 54-11, p. 1). By September 2001, Mills-Conoly had fully completed the fire alarm replacement project for the University. (Doc. 51-1, p. 30; Doc. 55-4).

On October 26, 2001, the University and Mills-Conoly amended the 1999 agreement for the fire alarm replacement project. (Doc. 55-6, p. 3). According to the October 26, 2001 amendment, the University hired Mills-Conoly to look at Montevallo's existing electric system, verify what was there, and prepare recommendations for corrective action based on Mills-Conoly's engineering judgment about "what needed to be done." (Doc. 55-6, p. 3; Doc. 51-1, pp. 32–33).

4

In connection with Mills-Conoly's work under the 2001 amendment, Craig Mills, the President of Mills-Conoly, visited the University's campus several times to investigate and survey the University's existing electrical system. (Doc. 33-4, p. 3; Doc. 51-1, pp. 46–47). Mr. Mills testified that "[a] site visit would consist of taking any existing documents that we had that the [U]niversity provided to us, and creating a schematic and a site plan of the equipment that we surveyed . . . ." (Doc. 51-1, p. 46). According to Mr. Mills, the documents he received were not "very good," and the University "wanted [] [him] to prepare the as-built documents" because the University "didn't have anything up-to-date." (Doc. 51-1, p. 47). During the site visits, Mr. Mills and University plant personnel looked at the University's electrical installations, "and if [they] saw anything that [they] felt like was a code issue, [they] would make a note of it and include it in [their] [] inspection report." (Doc. 51-1, pp. 46, 48).

Mills-Conoly's work under the 2001 amendment culminated in a "Primary Electrical Distribution Study for the University of Montevallo" dated October 24, 2002. (Doc. 33-4). The study identifies the scope of Mills-Conoly's work as follows:

> The scope of this project involves investigating the existing campus primary electrical distribution system for deficiencies, determining the most feasible solution to alleviate deficiencies and estimating the cost to repair/replace system(s) as required. The existing primary distribution system(s) will be evaluated for code compliance/deficiencies based on applicable Institute of Electrical and

Electronics Engineers (IEEE) and National Fire Protection Association (NFPA) code criteria, and sound engineering practice.

(Doc. 33-4, p. 3, ¶ 1.2).[1] According to the study's general section, the "study will outline survey findings, identify code violations and deficiencies, develop conclusions, make recommendations, and provide preliminary cost estimates based on recommendations." (Doc. 33-4, p. 3).

The second part of the study, entitled "Survey Findings," contains Mills-Conoly's observations and descriptions of the University's existing electrical system. (Doc. 33-4, pp. 4–10). Mills-Conoly reported the following relevant findings:

> Primary feeder No. 8 is fed from fused switch labeled "MS1C" [] and is fused at 125A. "MS1C" is antiquated and in need of replacement. Primary feeder No. 8 serves Tutwiler Hall, Bibb Graves Hall, Hanson Hall, Coner Hall, Morgan Hall, Farmer Hall, Myrick Hall, McCall Pool and Child Study Center via transformers "T25" through "T33."[2] . . .
>
> [] Primary feeder No. 9 is fed from fused switch labeled "MS1D" [] and is fused at 150 A. "MS1D is antiquated and in need of replacement. Primary feeder No. 9 serves the Central Utilities Plant via transformer "T34" []. Transformer installation does not appear to meet the clearance and marking requirement of NESC 410.
>
> . . .

---

[1] The applicable code editions are the 1999 National Electrical Code and the 1997 National Electrical Safety Code. (Doc. 51-1, p. 43).

[2] Transformers T25 through T33 include the transformers housed in the enclosure at issue in this case. (*See* Doc. 33-4, p. 9).

> Transformers housed in transclosure to form a three phase transformer bank generally are in poor condition. Generally the housings have deteriorated and [are] in need of replacement. . . .
>
> [] Open transformer banks enclosed with fencing appear to be in fair condition but are very unsightly. There are several open transformer banks within buildings. This is a dangerous condition and needs to be alleviated.

(Doc. 33-4, pp. 6, 10).

Mr. Mills testified that the study contained an error: the study should have identified NESC section 110 instead of section 410. (Doc. 51-1, p. 59). Section 110 of the 1997 NESC is "titled protective arrangements and electric supply stations," and the section "refers to clearances and warning signs" for electrical enclosures. (Doc. 51-1, p. 60). Although Mills-Conoly noted the warning sign deficiencies with respect to "Primary feeder No. 9," Mills-Conoly did not note a similar deficiency with respect to "Primary feeder No. 8," which services Farmer Hall. (*See* Doc. 33-4, p. 6).[3]

The third and fourth parts of the study contain Mills-Conoly's conclusions and recommendations for the University's electrical system. (Doc. 33-4, pp. 11–13). Mills-Conoly concluded that "[t]he entire primary distribution system is in need of upgrading" and that "[t]he original primary switchgear and associated feeders are

---

[3] Mr. Mills testified that he has no direct evidence of whether a sign was present on the Farmer Hall enclosure in 2002. (Doc. 51-1, p. 86). Mr. Mills did testify, however, that "if . . . there was not a sign on the fence" of the Farmer Hall enclosure in 2002, he would have included that deficiency in his study. (Doc. 51-1, p. 86–87).

7

in need of total replacement." (Doc. 33-4, p. 11). Mills-Conoly also concluded that Alabama Power Company's planned change to a "more efficient 12470Volt [] system" "will necessitate a complete primary underground distribution system upgrade for [] Montevallo," which in turn "will require replacement of existing building transformers . . . ." (Doc. 33-4, p. 11). Based on its findings and conclusions, Mills-Conoly recommended that the University "[r]eplace the existing electrical primary distribution system" and also recommended that the new primary distribution system include pad-mounted transformers. (Doc. 33-4, p. 13).[4] Mills-Conoly also prepared preliminary estimates of the cost of replacing the University's electrical distribution system. (Doc. 33-4, pp. 30–32).

At the time of Mr. Hume's injury, the University had not implemented any of Mills-Conoly's recommendations for the subject enclosure. (Doc. 57-1, p. 98; Doc. 57-2, pp. 470–71, 474). In fact, the University did not act on any of Mills-Conoly's recommendations.

## C. Mr. Hume's Lawsuit

Mr. Hume filed this action on June 8, 2016, and he has amended his complaint twice. (Doc 1; Doc. 17; Doc. 26). Mr. Hume added Mills-Conoly as a defendant in

---

[4] Pad-mounted transformers are fully enclosed. (Doc. 57-1, p. 96). Had the University implemented this recommendation between 2002 and 2015, Mr. Hume would not have been injured. (*See* Doc. 76-3, pp. 489–90).

this action through his second amended complaint. (Doc. 26). Mr. Hume asserts breach-of-contract, negligence, and wantonness claims against Mills-Conoly based on allegations that Mills-Conoly failed to identify deficiencies in the University's electrical system and failed to recommend appropriate corrections for those deficiencies. (Doc. 26, ¶¶ 135–146).

## III. ANALYSIS

### A. <u>Negligence and Wantonness</u>

Under Alabama law, a defendant's negligence is actionable only if the negligence proximately causes the plaintiff's injuries. *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994).[5] So too with wantonness: "'Proximate cause is an essential element of both negligence claims and wantonness claims.'" *Lemley v. Wilson*, 178 So. 3d 834, 841–42 (Ala. 2015) (internal citations omitted) (quoting *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994)). In Alabama, "[p]roximate cause is an act or omission that in a natural and continuous sequence, unbroken by any new independent causes, produces the injury and without which the injury would not have occurred." *Lemley*, 178 So. 3d at 842.

---

[5] "Alabama law follows the traditional conflict-of-law principles of *lex loci contractus* and *lex loci delicti*." *Lifestar Response of Ala., Inc. v. Admiral Ins. Co.*, 17 So. 3d 200, 213 (Ala. 2009) (citing *Liberty Mut. Ins. Co. v. Wheelwright*, 851 So. 2d 466 (Ala. 2002)). The contract between the University and Mills-Conoly was formed in Alabama, and Mr. Hume's injury occurred in Alabama. Thus, the Court applies Alabama law to Mr. Hume's claims against Mills-Conoly.

9

"Although the existence of proximate cause is 'almost always' a question of fact, almost always is not always." *Hammonds v. United States*, 418 Fed. Appx. 853, 857 (11th Cir. 2011) (quoting *Thompson v. Gaier*, 512 So. 2d 775 (Ala. 1987)). A district court may enter judgment based on a failure of proof of proximate cause if the non-moving party cannot present "substantial evidence" on the issue. *Wilbanks v. Utd. Refractories, Inc.*, 112 So. 3d 472, 474 (Ala. 2012). Speculative or conjectural evidence "does not rise to the level of substantial evidence." *McGinnis v. Jim Walter Homes, Inc.*, 800 So. 2d 140, 145 (Ala. 2001).

Mr. Hume's claims against Mills-Conoly "are based on the fact that [Mills-Conoly] failed to identify specific deficiencies in the subject enclosure . . . ." (Doc. 86, p. 4). Mr. Hume contends that had Mills-Conoly recommended installing warning signs on, or a protective cover over, the Farmer Hall enclosure—as opposed to a complete electrical-system overhaul—his injury would not have occurred. (Doc. 86, p. 7). Mills-Conoly responds that accepting Mr. Hume's conclusion about proximate causation would require the Court to make "speculative and inferential leaps." (Doc. 91, p. 9). Mills-Conoly has the better argument.

The evidence connecting Mills-Conoly's failure to recommend warning signs with Mr. Hume's injury raises "nothing more than speculation, conjecture, or a guess." *See McGinnis*, 800 So. 2d at 145. Specifically, with respect to signage, a finding of proximate cause would require jurors to assume as true the following: (1)

there were no warning signs on the subject enclosure when Mills-Conoly conducted its 2002 study; (2) had Mills-Conoly recommended additional signage on the subject enclosure, the University would have approved and implemented that recommendation; (3) had the University approved and implemented the recommendation, the added signs would have been installed; (4) had the signs been installed, they would have remained properly installed for the twelve-year period between their installation and Mr. Hume's accident; and (5) had the signs remained installed for twelve years, Mr. Hume would have heeded their warnings. This asks too much of the rule that a district court must draw inferences in favor of the non-moving party.

To avoid summary judgment, Mr. Hume points to his own testimony and the testimony of Eddye Lawley—the Director of the University's Physical Plant at the time of Mills-Conoly's 2002 study. (*See* Doc. 86, pp. 7–8). Mr. Lawley testified that "[h]ad Mills-Conoly Engineering recommended the placement of warning signs on all three sides of the enclosure [he] would have ensured that work was done." (Doc. 85-2, p. 2). Mr. Hume testified that "had the enclosure been signed with warnings and electrical type signs[,]" he would not have entered it. (Doc. 76-68, pp. 216–17; Doc. 86, p. 8). This, Mr. Hume argues, establishes a causal link between Mills-Conoly's failure to recommend installing warning signs on the subject enclosure and his injury. (Doc. 86, p. 18).

11

Even if the Court assumes Mr. Lawley and Mr. Hume's statements were true, those statements do not establish proximate causation. Mr. Hume's conclusion fails to account for the nearly thirteen-year period between Mills-Conoly's report and his injury, as well as the role University personnel would play in maintaining any added signs over those 13 years. Mr. Hume's own expert, Michael Anthony, testified that "[b]ased on the evidence, it is clear that the Montevallo employees did absolutely nothing to maintain signage on the subject enclosure." (Doc. 76-3, p. 167). Mr. Anthony added that this case is "not just about signs. It's a deeper problem with the University of Montevallo management . . . ." (Doc. 76-3, p. 182). According to Mr. Anthony, because of these deeper problems, "no one ever noticed that there was no sign in [sic] the subject enclosure" during the four years preceding Mr. Hume's injury. (Doc. 76-3, pp. 169–70, 227–28). Far from establishing that University personnel would have maintained any recommended signage, the evidence presented by Mr. Hume tends to point to the opposite conclusion: University personnel would not have adequately maintained added signage between 2002 and 2015.

Mr. Hume alternatively points to Mills-Conoly's failure to recommend a protective cover over the Farmer Hall enclosure as a proximate cause of his injuries. (Doc. 86, p. 18). In response, Mills-Conoly contends that Mr. Hume's argument "is premised entirely on the speculation and conjecture that . . . if it recommended a top

be placed over the enclosure, th[at] recommendation[] would have been followed by Montevallo." (Doc. 91, p. 9). That is so.

As stated, a theory of proximate causation may not rest on "mere conjecture and speculation." *Townsend v. General Motors Corp.*, 642 So. 2d 411, 423 (Ala. 1994). Instead, a theory of causation must rise to the level of reasonable inference. A reasonable inference "is a reasonable deduction of fact, unknown or unproved, from a fact that is known or proved." *Khirieh v. State Farm Mut. Auto. Ins. Co.*, 594 So. 2d 1220, 1224 (Ala. 1992) (citations and quotations omitted).

Here, Mr. Lawley testified that he would have ensured the installation of a protective cover on the subject enclosure had Mills-Conoly recommended one. (Doc. 85-2, p. 2). This testimony is inherently speculative—it is an opinion, given almost 16 years after the fact and with the benefit of hindsight, about what Mr. Lawley would have done under different circumstances. And even if the Court assumes that Mr. Lawley would have approved of Mills-Conoly's recommendation in 2002, there is no evidence that the University would have done the same. In fact, there appears to be evidence to the contrary. At the time of Mr. Hume's injury, the University had not adopted even one of Mills-Conoly's recommendations as to the Farmer Hall enclosure. (Doc. 57-2, pp. 470–71, 474).

As with signs, Mr. Hume's theory of proximate causation regarding a cover rests on stacked assumptions: it requires an assumption about what Mr. Lawley

would have done 16 years ago and a further assumption about what the University would have done. Alabama law does not permit such speculation. *See generally K.D. ex rel. J.D. v. Wooten*, 2015 WL 1138492, at *8 (N.D. Ala. Mar. 13, 2015) (citing *D.A.C. ex rel. D.D. v. Thrasher*, 655 So. 2d 959, 962 (Ala. 1995)) (theory of proximate causation failed at summary judgment when it required speculation about what the Birmingham Board of Education would have done with information that it did not receive).

Therefore, because Mr. Hume has failed to demonstrate by substantial evidence a genuine dispute of material fact on the issue of whether Mills-Conoly's failure to recommend warning signs or a protective cover for the subject enclosure was the proximate cause of Mr. Hume's injuries, the Court concludes that Mills-Conoly is entitled to summary judgment on Mr. Hume's negligence and wantonness claims.

### B. Breach of Contract

Mr. Hume's breach-of-contract claim against Mills-Conoly rests on the same conduct that underlies his negligence and wantonness claims, namely Mills-Conoly's failure to recommend the installation of warning signs and a protective cover on the subject enclosure. (Doc. 86, pp. 22–24). For breach-of-contract claims in Alabama, "the damages claimed must be the natural and proximate consequences of the breach . . . ." *HealthSouth Rehab. Corp. v. Falcon Mgmt. Co.*, 799 So. 2d 177,

14

183 (Ala. 2001) (quoting *Aldridge v. Dolbeer*, 567 So. 2d 1267, 1269–70 (Ala. 1990) (citations and quotations omitted)). As above, even if Mills-Conoly breached its agreement with the University, that breach did not proximately cause Mr. Hume's injuries. Thus, Mills-Conoly is entitled to summary judgment on Mr. Hume's breach-of-contract claims.

**IV. CONCLUSION**

Based on the foregoing, the Court grants Mills-Conoly Engineering's motion for summary judgment, (Doc. 77).

**DONE** and **ORDERED** this October 16, 2019.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE