UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JOSEPH MICHAEL HUME, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 2:16-CV-00954-MHH |
| | ) |
| WILLIAM L. HUGHES, KERRY G. LOVELESS, MILLS-CONOLY ENGINEERING, P.C., | ) ) ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

This action arises from injuries plaintiff Joseph Michael Hume suffered after he entered an enclosure containing high voltage electrical equipment on the University of Montevallo campus in 2015. Defendants William Hughes and Kerry Loveless worked for the University of Montevallo at the time of Mr. Hume's accident. Mr. Hughes and Mr. Loveless ask the Court to enter judgment in their favor on Mr. Hume's negligence and wantonness claims against them. (Doc. 80). For the reasons explained below, disputed questions of fact preclude summary judgment.

**I. STANDARD OF REVIEW**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences in the light most favorable to the non-moving party. *Asalde v. First Class Parking Sys.*, 898 F.3d 1136, 1138 (11th Cir. 2018). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II. FACTUAL AND PROCEDURAL BACKGROUND

The factual record in this case is extensive. The facts relevant to Mr. Loveless's and Mr. Hughes's motion for summary judgment are these: at the time of his accident, Mr. Hume was a sophomore at the University of Montevallo. (Doc. 76-68, p. 12). One summer evening in 2015, he and two friends began playing frisbee golf on the campus's "makeshift course." (Doc. 76-68, pp. 19, 182). While playing, one of the frisbees fell into an unmarked enclosure connected to Farmer Hall, the University's Student Center. (Doc. 76-68, pp. 16, 36).

One side of the enclosure is a chain-link locked fence; the other two accessible sides are brick. (Doc. 76-70; *see also* Doc. 76-68, pp. 42–43). From where Mr. Hume was standing, he faced a brick wall; Mr. Hume did not approach the enclosure from the chain-link side. (Doc. 76-68, pp. 42–43; *see also* Doc. 76-76 (photograph where Mr. Hume marks where he climbed onto the wall)). Mr. Hume asked his friends if they could retrieve the frisbee. (Doc. 76-68, p. 55). When his friends said that they could not get the frisbee from their side, Mr. Hume "hopped up on top of the wall and hopped in[to the enclosure] to recover the frisbee." (Doc. 76-68, pp. 55–56). At the time of Mr. Hume's accident, there were no warning signs on the enclosure indicating that it was a high-voltage area. (Doc. 57-1, pp. 276, 298; Doc. 78-12, pp. 75–76).

Mr. Hume swung into the enclosure, grabbed the frisbee, and moved to leave the enclosure. (Doc. 76-68, pp. 74, 79; *see* Doc. 76-79 (noting where the frisbee was inside the enclosure)). As he left the enclosure, Mr. Hume contacted a transformer and suffered a severe shock. (Doc. 26, ¶ 15; Doc. 76-68, pp. 89–90). Mr. Hume asserts that the enclosure should have had warning signs to alert people that it contained dangerous high voltage equipment. (Doc. 26, ¶ 16). It is undisputed that years before Mr. Hume's accident, Mr. Loveless secured a warning sign to the enclosure.

The University of Montevallo has owned and operated the Farmer Hall transformer since it was installed in the early 1960s. (Doc. 57-2, pp. 298, 483; Doc. 76-16, p. 93; Doc. 76-1, p. 3). William Hughes is the director of the physical plant for the University. (Doc. 78-12, pp. 110–11). Mr. Hughes supervises Kerry Loveless, the University's electrical supervisor. (Doc. 51-1, p. 182; Doc. 78-19, pp. 33–34). Mr. Hughes has no background as an electrician and assigned Mr. Loveless responsibility for electrical maintenance and safety on campus. (Doc. 78-13, pp. 16, 45–46).

Mr. Hughes's responsibilities as "Director of Physical Plant" are detailed in the University's written position description for that job. (Doc. 78-17, p. 37). Item number 4 in the section titled "Essential Job Duties" states that the plant director:

> Implement[s] program for continuous and reliable operation of facilities, including routine and preventative maintenance for all campus buildings, (including real property) and grounds including landscape maintenance, custodial services, plumbing, painting, carpentry, heating and cooling and electrical.

(Doc. 78-17, p. 37). Item 6 states that the plant director "[o]versees utility services for steam, chill water, drinking water, sewer, natural gas and electricity." (Doc. 78-17, p. 38). And item 8 states that the plant director "[e]nsures organizational compliance with applicable codes, rules and regulations." (Doc. 78-17, p. 38).

Mr. Loveless's responsibilities as "Supervisor-Electrical Shop" are detailed in the University's written position description for that job. (Doc. 78-17, p. 45). The

4

general description details the broad purpose of the job as follows: "to plan, develop, organize, direct and evaluate all aspects of the Electrical Department and provide supervision of department personnel." (Doc. 78-17, p. 45). Mr. Loveless was, among other things, required to "[s]upervise and perform work on high and low voltage electrical systems"; "[p]articipate in the planning, layout and estimating of new or modified electrical systems and upgrades"; "[p]rovide technical guidance on jobs performed"; and "[e]nsure training of staff is consistent with the skill levels and requirements within the department." (Doc. 78-17, pp. 45–46). Mr. Loveless had the ultimate responsibility for the electrical equipment and the enclosure involved in Mr. Hume's accident. (Doc. 78-20, p. 87).

In 2002, Mills-Conoly, an engineering firm that the university retained to survey the campus's existing electric system and prepare recommendations for corrective action, (Doc. 55-6, p. 3; Doc. 51-1, pp. 32–33), advised the university that various transformer configurations on campus were dangerous. In a written report to the University, Mills-Conoly stated:

> Transformers housed in transclosure to form a three phase transformer bank generally are in poor condition. Generally the housings have deteriorated and [are] in need of replacement. . . .
>
> [] Open transformer banks enclosed with fencing appear to be in fair condition but are very unsightly. There are several open transformer banks within buildings. This is a dangerous condition and needs to be alleviated.

5

(Doc. 33-4, pp. 6, 10). It is undisputed that the university took no action in response to the report. Jurors reasonably may infer that at that the time of Mr. Hume's accident in 2015, the condition of the transformer enclosures on the University's campus were at least as poor as they were in 2002. Additionally, jurors reasonably may infer that Mr. Hughes and Mr. Loveless were aware of the deficiencies in the transformer enclosures on campus.

In 2015, the Electrical Department had a work order for "High voltage system inspection, Annually." (Doc. 78-33, pp. 8-11; *see also* Doc. 78-20, pp. 98-99). Mr. Loveless explained:

> Now, there was a work order that was made for high voltage, to check the locks on it. It was just something I had made to annually – It's a yearly thing, just to make sure all the locks are functioning.

(Doc. 78-20, pp. 91–92; *see also* Doc. 78-13, p. 87). Mr. Loveless created the work order, and he assigned the work order to himself to remind himself "to oil the locks every year." (Doc. 78-20, pp. 101-102; Doc. 78-33, pp. 8-11, 13-14). According to University records, a February 2009 work order for the annual high voltage inspection was completed in January 2010. (Doc. 78-33, p. 8). A February 2010 work order for the annual high voltage inspection was completed in October 2010. (Doc. 78-33, p. 9). A February 2011 work order for the annual high voltage inspection was completed in April 2012. (Doc. 78-33, p. 10). A February 2012

6

work order for the annual high voltage inspection was completed in September 2013. (Doc. 78-33, p. 11). A February 2014 work order for the annual high voltage inspection was completed in August 2014. (Doc. 78-33, p. 8). And a February 2015 work order for the annual high voltage inspection was completed on September 30, 2015. (Doc. 78-33, p. 14).[1]

The University did not have an inspection protocol pertaining to warning signs on high voltage electrical enclosures on campus. (Doc. 78-13, p. 87; Doc. 78-20, pp. 77–78, 91). If a plant or electrical employee happened to notice that a sign was missing, the employee would report the missing sign, and someone would replace it, but there were no annual inspections of signage. (Doc. 78-13, p. 55). Jurors reasonably could infer that Mr. Loveless and the members of his staff could survey

---

[1] After acknowledging the work order for annual review of the locks on enclosures containing high voltage equipment, Mr. Loveless testified that the work order was more of a suggestion than a requirement, and that the work order only reminded him to oil the locks on high voltage enclosures, not to make certain that locks were secured. He acknowledged that he had oiled the lock on the enclosure in which Mr. Hume was injured before Mr. Hume's accident, but he could not recall the year in which he oiled the lock. He stated that the "annual" aspect of the work order was more of a suggestion than a requirement – "if you get a chance . . . It was something that needed to be done if we had time." (Doc. 78-20, pp. 93–97). Jurors, not the Court, are judges of credibility. Jurors will have to determine whether to believe Mr. Loveless's evolving description of the annual work order.

In addition to the annual inspections of the locks on the high voltage enclosures on the University's campus, the record indicates that between September 25, 2013 and September 30, 2015, Mr. Loveless conducted at least four lighting inspections at Farmer Hall. Jurors reasonably could infer that Mr. Loveless visited Farmer Hall more than once each year. (Doc. 78-33, pp. 28–61).

7

the signage on the transformer enclosures annually when they surveyed the locks on the enclosures.

## III. ANALYSIS

Mr. Hughes and Mr. Loveless contend that state-agent immunity bars Mr. Hume's negligence and wantonness claims against them. Alabama law requires courts to evaluate assertions of state-agent immunity under a burden-shifting framework. *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003). First, a state agent "'bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitled the State agent to immunity.'" *Ex parte Lawley*, 38 So. 2d 41, 47 (Ala. 2009) (quoting *Ex parte Reynolds*, 946 So. 2d 450 (Ala. 2006)). To examine the function component of state agent immunity, a court must examine whether:

> the conduct made the basis of the claim against the agent is based upon the agent's:
>
> (1) formulating plans, policies, or designs; or
>
> (2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
>
> …
>
> (b) allocating resources;
>
> …
>
> (d) hiring, firing, transferring, assigning, or supervising personnel; . . . ."

8

*Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000) (emphasis in original). If a state employee's conduct falls into one of these categories, then the burden shifts to the plaintiff to demonstrate by substantial evidence that one of the two exceptions to state-agent immunity applies: either (1) the action was done willfully, maliciously, fraudulently, in bad faith, or in way that exceeded the scope of the state agent's authority; or (2) the action was forbidden by state or federal law. *Ex parte Price*, 256 So. 3d 1184, 1191 (Ala. 2018).

Here, Mr. Hume's claims against Mr. Hughes and Mr. Loveless concern the allocation of resources. Mr. Hume contends that "the Defendants' 'informal policy' to replace a sign if someone happened to notice it was missing does not satisfy the requirements of the NEC and NFPA 70E . . . ." (Doc. 87, p. 13). Mr. Hughes and Mr. Loveless argue that because the Electrical Department had only a few employees to service all the buildings on campus, the department followed an "as needed" policy for reviewing and replacing signage on high voltage enclosures. This determination of allocation of department resources is a discretionary function which may provide the basis for state agent immunity. *Ex parte Cranman*, 792 So. 2d at 405. Thus, the burden shifts to Mr. Hume to prove an exception to immunity.

To carry his burden, Mr. Hume first argues that state-agent immunity does not apply here because Mr. Hughes and Mr. Loveless were acting beyond their authority. (Doc. 87, pp. 11–12). Mr. Hume focuses on the NEC and NFPA, arguing that both

9

codes "imposed affirmative, mandatory duties to install and maintain a warning sign on the subject enclosure, and [that defendants] had no discretion with respect to whether or not they had to comply with these duties." (Doc. 87, p. 7). Mr. Hughes and Mr. Loveless reject this characterization and argue that the NEC and NFPA regulations are not detailed enough to rob them of their immunity. (Doc. 90, pp. 6–8). Mr. Hughes and Mr. Loveless have the better argument.

*Cranman*'s "beyond authority" exception applies when a state agent "fails 'to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.'" *Giambrone*, 874 So. 2d at 1052 (quoting *Ex parte Butts*, 775 So. 2d 173, 178 (Ala. 2000)). Mr. Hume argues that NEC section 110.34(C) is such a checklist. (Doc. 87, p. 7). The Court disagrees.

NEC section 110.34(C) provides that all "enclosures containing live parts or exposed conductors operating at over 600 volts" must have "[p]ermanent and conspicuous danger signs." (Doc. 76-8, p. 35). Craig Mills, the president of Mills-Conoly Engineering, interprets section 110.34(C) as requiring a warning sign only on the chain-link side of the Farmer Hall enclosure. (Doc. 51-1, p. 87). Mr. Loveless echoes Mr. Mills, testifying that he does not read section 110.34(C) to require "a sign on a [brick] wall that's eight foot [sic] tall." (Doc. 78-21, pp. 49–50). Mr. Hume's expert witness, Michael Anthony, interprets section 110.34 of the NEC as

requiring warning signs on the exterior of all sides of the Farmer Hall enclosure. (Doc. 76-3, pp. 182–83).[2]

These competing interpretations show that the language of the standard leaves room for interpretation and, therefore, the operation of discretion. As a result, NEC section 110.34(C) is "'not the type of detailed rule[] or regulation[]' that would remove a State agent's judgment in the performance of required acts." *Ex parte Spivey*, 846 So. 2d 322, 333 (Ala. 2002) (quoting *Ex parte Butts*, 775 So. 2d at 178). Thus, Mr. Hume has not demonstrated that the NEC and NFPA are "'the type of detailed rules or regulations' that would remove a State agent's judgment in the performance of required acts," such that Mr. Hughes or Mr. Loveless could be said to have acted beyond the authority that the electrical standards afford. *Ex parte Spivey*, 846 So. 2d at 333 (quoting *Ex parte Butts*, 775 So. 2d at 178).

Still, a state-agent "shall not be immune from civil liability in his [] personal capacity" when he acts willfully or in bad faith. *Giambrone*, 874 So. 2d at 1057

---

[2] The logic underlying Mr. Anthony's conclusion goes something like this: section 110.34(C) "requires that the entrances to enclosures containing exposed live parts . . . must have 'permanent and conspicuous' warning signs"; the opening at the top of the Farmer Hall enclosure is an "entrance"; that "entrance" is accessible from the chain-link side and both brick sides of the Farmer Hall enclosure; the word "conspicuous" requires a warning sign at any access point of any "entrance"; thus, section 110.34(C) required warning signs on all three sides of the Farmer Hall enclosure. (Doc. 76-5, pp. 5, 7, 12–13; *see* Doc. 76-3, pp. 100, 105).

The Alabama Fire Marshall offers yet another take: "[R]equired signage must be permanent and legible as long as the electrical equipment remains within the enclosure." (Doc. 101-1, p. 3). The Fire Marshall gives no opinion on the meaning of "required signage."

(citing *Ex parte Cranman*, 792 So. 2d at 405). A jury must determine whether the evidence relating to Mr. Hughes's and Mr. Loveless's purported effort to maintain warning signs on high voltage areas on an "as needed" basis is merely a *post hoc* characterization of the defendants' abdication of their responsibility for maintaining warning signs on dangerous enclosures. If a jury makes such a finding, then the defendant's conduct rises to the level of bad faith or willful conduct.

According to Mr. Hughes, "[i]f a sign was missing, [University personnel] would replace it." (Doc. 76-38, p. 145). Mr. Hughes testified that the University's policy required University personnel to notify Coty Jones—the assistant facilities director in 2002—that a sign was missing; Coty Jones was then required to inform Mr. Loveless and the electrical department; and the electrical department would replace the sign. (Doc. 76-38, p. 145–46). Coty Jones testified that while he worked at the University, he did not know what types of signs had to be on high voltage electrical enclosures; he was unaware that he was responsible for warning signs on electrical enclosures; and he could not identify the last time a warning sign was on the Farmer Hall enclosure. (Doc. 76-80, pp. 36, 40, 46).

For his part, Mr. Loveless clearly knew that a warning sign had to be on the enclosure at Farmer Hall, at least on the chain-link side of the enclosure, because he had replaced the sign on one occasion when he noticed that the sign was missing. (*See* Doc. 57-1, pp. 270–73; Doc. 57-2, pp. 23–24). The evidence indicates that Mr.

Loveless serviced the lock on the enclosure approximately once each year. (Doc. 78-20, pp. 93–97). The evidence, viewed in the light most favorable to Mr. Hume, also indicates that there was no sign on the Farmer Hall enclosure on the night of his injury and that, before his injury, the last time a sign was affixed to the Farmer Hall enclosure was some time in 2008 or 2009. (*See* Doc. 85-3, pp. 3–12) (Photograph from 2011 showing no warning signs on the fence of the Farmer Hall enclosure); (Doc. 57-1, p. 273; Doc. 76-3, pp. 169–70, 227–28). Jurors could reasonably conclude that nothing prevented Mr. Loveless from maintaining the one sign that the University placed on the enclosure when he visited the enclosure to service the lock on the chain-link gate.

The defendants argue that they may, in their discretion, determine the frequency of inspections of signage. That is true, but a policy that requires no routine inspection of signs affixed to enclosures housing hazardous electrical components—even an annual inspection—is no policy at all and is evidence at least of bad faith, especially when the required inspection only would require Mr. Loveless to glance up from the lock that he examined each year.

## IV. CONCLUSION

Based on the foregoing and the discussion during the September 26, 2019 hearing, the Court denies Mr. Hughes and Mr. Loveless's motion for summary judgment, (Doc. 80).[3]

**DONE** and **ORDERED** this October 28, 2019.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[3] This opinion addresses Mr. Hughes's and Mr. Loveless's state agent immunity argument. By separate opinion, the Court will address the defendants' alternative arguments for summary judgment.